**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RONALD M. ZETINO,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

*Respondent.*

No. 08-70390

Agency No.
A094-175-859

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 9, 2009—Pasadena, California

Filed February 18, 2010

Before: Cynthia Holcomb Hall and Richard C. Tallman,
Circuit Judges, and David M. Lawson,* District Judge.

Opinion by Judge Tallman;
Concurrence by Judge Lawson

---

*The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

2539

## COUNSEL

Niels W. Frenzen, Esq., (argued), University of Southern California Law School Immigration Clinic, Los Angeles, California, for petitioner Zetino.

Sunah Lee, Esq., (argued), U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, D.C.,

Ronald E. LeFevre, Esq., Department of Homeland Security, Office of the District Counsel, Los Angeles, California, for respondent Attorney General Holder.

---

## OPINION

TALLMAN, Circuit Judge.

Ronald Zetino ("Zetino"), a native and citizen of El Salvador, petitions for review of a Board of Immigration Appeals ("BIA") decision upholding an Immigration Judge's ("IJ") denial of his applications for asylum and withholding of removal. We must decide whether we have jurisdiction to review for abuse of discretion the BIA's discretionary denial of a petitioner's motion to accept an untimely brief. We hold we lack jurisdiction over this part of the petition because there is no meaningful standard against which to judge the agency's exercise of discretion. We deny the remaining challenges on the merits.

### I

Zetino illegally entered the United States on December 5, 1989, at San Ysidro, California. Zetino was detained on May 1, 2001, and placed in removal proceedings on May 15, 2001. He was charged with removability pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled.

At Zetino's first removal hearing on May 31, 2001, the IJ informed him of his right to counsel and right to call witnesses on his behalf. The IJ also provided Zetino with a list of free legal aid services. Zetino acknowledged those rights, waived them, admitted to the allegations against him, and conceded removability. Zetino informed the IJ that he feared

persecution upon return to El Salvador, at which time the IJ gave him an application for asylum. At a continued removal hearing on June 11, 2001, Zetino did not submit an application for asylum, but instead requested a continuance to find an attorney. The IJ granted that request, noting that Zetino claimed to have obtained an attorney who had decided not to represent him "at the last minute."

Zetino's next removal hearing took place on September 27, 2005, after an additional continuance during which he remained incarcerated. At that hearing, the IJ once again informed Zetino of his right to counsel, which Zetino acknowledged. The IJ then granted Zetino yet another continuance to obtain counsel. Zetino finally filed his application for asylum on October 25, 2005.

Zetino's hearing on the merits of his asylum application began on May 14, 2007. Zetino appeared *pro se*, apparently unable to obtain counsel in the six years since his first hearing. The IJ took testimony from Zetino, his mother, and his sister.

Zetino testified that he was afraid to return to El Salvador because he had been told that in 1993 six members of his family had been killed by gunfighters attempting to steal his grandfather's land. Zetino noted that this event took place after his illegal arrival in the United States and that he only found out about it through word of mouth. When the IJ asked him to explain the motive for the murders, Zetino responded, "Some farmers who supposedly . . . were my grandfather's friends and they wanted more land so they could cultivate on that [sic] and my grandfather did not want to release the land to them." Zetino also testified that he feared gang members would attempt to recruit or harm him. He stated simply, "There are too many gang members. I don't think that I will be able to work there at [inaudible] with ease."

Zetino's mother testified that masked gunmen had killed members of her family for "revenge because of some proper-

ties, some land [sic]." Zetino's sister testified that she was not in El Salvador at the time of the alleged killings.

After taking testimony, the IJ rendered an oral decision in which she determined Zetino had testified credibly but still failed to demonstrate a well-founded fear of persecution based on statutorily-protected grounds. The IJ ruled that Zetino failed to establish a nexus between the murder of his relatives or gang recruitment and a protected ground such as race, religion, nationality, membership in a particular social group, or political opinion. As to the killing of his relatives, the IJ noted that it "was clearly a personal dispute, if anything, amongst the ones who wanted to cultivate the land next door . . . . This is not a basis for asylum or withholding of removal under the Act."

On September 6, 2007, Zetino filed a *pro se* Notice of Appeal to the BIA stating that he disagreed with the IJ's decision that "[he] didn't prove [his] case." Zetino's Notice of Appeal contained a well-articulated statement of his case. He argued that his "fear of persecution and torture is based on the assassination of [his] family members and relatives by 11 masked gunmen who assassinated them and who are still at large." He also stated that he feared "gang members who are at large, who sell drugs and arms, who also hurt and rob people like [him], because [he] also [has] tattoos (none gang-related) and they would mistake [him] for being a rival gang member."

On October 20, 2007, Zetino was transferred from the San Pedro Detention Complex in Los Angeles, California, to the South Texas Detention Complex in Pearsall, Texas. On October 23, 2007, the BIA issued a briefing schedule notifying Zetino of a November 13, 2007, deadline to file an appellate brief. Zetino properly notified the BIA of his move with a change of address form on October 31, 2007, and as a result the BIA granted him a filing extension from his original deadline of November 13, 2007, to November 30, 2007. Despite

notice of the extension, Zetino did not file a brief before this extended deadline.

Five days after missing the filing deadline, on December 5, 2007, Zetino secured the representation of the University of Southern California Law School Immigration Clinic. On December 14, 2007, his counsel filed a Motion to Accept Late Brief and Motion for Extension of Time requesting the BIA accept a late brief or extend the filing deadline to "accommo-date student exams and the ensuing winter break." The BIA found "the reasons stated by the respondent insufficient for [it] to accept an untimely brief in [its] exercise of discretion." The BIA also denied the extension request "as it was received after the expiration of the filing deadline."

Despite Zetino's failure to properly file an appellate brief, the BIA considered the merits of his application because he had sufficiently articulated his challenges to the IJ's decision in his Notice of Appeal. The BIA subsequently upheld the IJ's determination on the merits. The BIA reasoned that neither Zetino's fear of "the eleven unidentified masked gunmen who fatally shot his aunt, uncle, and at least three cousins in 1993 and who remain at large" nor his fear of "gang members [who] might mistake him for a member of a rival gang because he has tattoos" established a well-founded fear of persecution "on account of his race, religion, nationality, membership in a particular social group, or political opinion." The BIA supported its conclusion by noting,

> It is well-established that an asylum applicant's fear of harm resulting from general conditions of vio-lence and civil unrest affecting the home country's populace as a whole does not constitute a "well-founded fear of persecution" within the meaning of the Act.

Furthermore, the BIA reasoned that Zetino's fear of harm by criminals or gangs did not "establish that he belongs to a 'par-

ticular social group' within the meaning of section 101(a)(42)(A) of the Act." The BIA relied on our decision in *Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007), where we held that a tattooed alien's membership in a violent criminal gang was not "social group" membership for withholding of removal purposes.

Zetino now timely petitions for review of the BIA's decision to reject his untimely brief as well as its decision to uphold the IJ's ruling denying his applications for asylum and withholding of removal.[1] He presents three distinct challenges, two procedural and one substantive.

First, Zetino claims the BIA's discretionary ruling refusing to accept his untimely brief or to extend the filing period was a violation of his due process rights and an abuse of discretion. The government argues that we do not have jurisdiction over the abuse of discretion challenge to the denial of the motion to accept a late brief because there is no meaningful standard against which to judge the discretionary ruling. We agree. However, we do have jurisdiction to review the BIA's denial of a motion to accept an untimely brief for a violation of due process. We find that the BIA's denial of the brief in this instance did not violate Zetino's due process rights.

Second, Zetino claims the IJ violated his due process rights by failing to develop a factually complete record or advise him of his right to counsel. This argument is without merit and is unsupported by the record.

Third, Zetino claims substantial evidence does not support the BIA's decision that he failed to demonstrate a nexus

---

[1]In his petition for review, Zetino does not challenge the IJ's denial of his application for protection under the United Nations Convention Against Torture. Accordingly, he has waived any challenge to that determination. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1260 (9th Cir. 1996).

between the harm he allegedly faces upon return to El Salvador and a protected ground such as race, religion, nationality, membership in a particular social group, or political opinion. Zetino fears return to El Salvador because in 1993 unidentified masked gunmen murdered members of his family motivated by a desire to steal his grandfather's land. Neither that event nor his fear of gangs bears a nexus to a protected ground.

Accordingly, we deny the petition for review in part and dismiss in part for want of jurisdiction.

## II

"[W]e have jurisdiction to determine our own jurisdiction." *Sareang Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000). We review questions of our own jurisdiction *de novo*. *Miller v. Comm'r*, 310 F.3d 640, 642 (9th Cir. 2002). Due process challenges to immigration proceedings are also reviewed *de novo*. *Padilla v. Ashcroft*, 334 F.3d 921, 923 (9th Cir. 2003). We review petitions for review of the BIA's determination that a petitioner does not qualify for asylum or withholding of removal under the highly deferential "substantial evidence" standard. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Under this standard, the petition for review must be denied if the BIA's determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* The petition for review may be granted only if the evidence presented "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* (citing *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)).

## III

Because Zetino filed his application for asylum after the May 11, 2005, effective date of the REAL ID Act of 2005, we have jurisdiction under Section 242 of the INA, 8 U.S.C.

§ 1252, as amended by the Act, Pub. L. No. 109-13, Div. B., 119 Stat. 231 (May 11, 2005).

## A

### i

Zetino first challenges the BIA's rejection of his untimely brief and refusal to extend the filing period as an abuse of discretion and a violation of his due process rights. Thus, we are asked to review four challenges: (1) an abuse of discretion challenge to the denial of the motion to accept a late brief; (2) a due process challenge to the denial of the motion to accept a late brief; (3) an abuse of discretion challenge to the denial of the motion to extend the filing period; and (4) a due process challenge to the denial of the motion to extend the filing period. However, we limit our analysis to Zetino's challenges to the BIA's denial of his motion to accept a late brief.[2] The government argues this court lacks jurisdiction over the first challenge, reviewing the denial of Zetino's motion to accept an untimely brief for an abuse of discretion, because the applicable regulation, 8 C.F.R. § 1003.3(c)(1), fails to provide a sufficiently meaningful standard. We agree.

**[1]** There are two grounds upon which to challenge appellate jurisdiction over a discretionary BIA decision. First, "no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this

---

[2]We construe Zetino's motion, filed two weeks after the filing deadline, as solely a motion to accept an untimely brief. An extension of the filing period was factually impossible because the filing period had already lapsed. In its order, the BIA noted its stated policy that a "request for an extension of time to file a brief must be received at the Board on or before [the] . . . due date." A motion to extend the filing period filed after the filing deadline can only result in the acceptance of an untimely brief. Accordingly, we treat Zetino's "Motion to Accept Late Brief and Motion for Extension of Time" as a motion to accept an untimely brief.

subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). Second, in *Ekimian v. INS*, 303 F.3d 1153, 1159 (9th Cir. 2002), we held that we do not have jurisdiction to review a discretionary BIA decision for an abuse of discretion where we "cannot discover a sufficiently meaningful standard against which to judge the BIA's decision." *Id.*

**[2]** Here, the first ground is not available.[3] The Attorney General solely invokes the latter challenge, which is applicable in this case. "Regardless whether § 1252(a)(2)(B)(ii) or other statutes affect our jurisdiction . . ., Ekimian requires us to determine whether there is a legal standard to apply in evaluating the BIA's action or inaction." *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114, 1119 (9th Cir. 2009). In *Ekimian* we declined to exercise jurisdiction over an abuse of discretion challenge to the BIA's refusal to exercise its discretion to *sua sponte* reopen deportation proceedings.[4] 303 F.3d at 1159. In *Diaz-Covarrubias* we declined to exercise jurisdiction over an abuse of discretion challenge to the BIA's denial of a request for an administrative closure. 551 F.3d at 1119.

**[3]** In both cases we were asked to review discretionary BIA decisions with little or no regulatory guidance as to how or when that discretion should be exercised. In both cases we identified three factors indicating the lack of a meaningful

---

[3]Section 1252(a)(2)(B)(ii) has been interpreted to only apply to discretionary decisions the authority for which is granted under *statute. See Kucana v. Holder*, 558 U.S. ___, ___ (2010) (slip op. at 10); *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 689-92 (9th Cir. 2003). The authority for the BIA's decision to reject a late brief is not granted by *statute*, but rather by *regulation. See* 8 C.F.R. § 1003.3(c)(1)

[4]The Supreme Court's decision in *Kucana* did not overrule *Ekimian*. In *Ekimian*, we held we lack jurisdiction to review the Board's decision not to reopen removal proceedings *sua sponte*. In *Kucana*, the Court "express-[ed] no opinion on whether federal courts may review the Board's decision not to reopen removal proceedings *sua sponte*." Slip op. at 10, n.18. Accordingly, *Ekimian* is still good law.

governing standard: (1) the applicable federal regulation did not specify a standard for the BIA to apply; (2) "no statutory language authorize[d] the BIA" to take the discretionary action; and (3) "no precedential BIA decision specified a standard for exercising its" discretionary authority over the matter. *Diaz-Covarrubias*, 551 F.3d at 1117 (quoting *Ekimian*, 303 F.3d at 1157-58) (internal quotation marks omitted). Finally, in both cases we held, "Because we cannot discover a sufficiently meaningful standard against which to judge the BIA's decision, we lack jurisdiction . . . ." *Diaz-Covarrubias*, 551 F.3d at 1119 (quoting *Ekimian*, 303 F.3d at 1159) (internal quotation marks omitted). We are equally deprived of such guidance in the present case and are accordingly unable to review the BIA's denial of a late brief for an abuse of discretion.

**[4]** Here, the regulation at issue, 8 C.F.R. § 1003.3(c)(1), merely states, "In its discretion, the Board may consider a brief that has been filed out of time." *Id.* An application of the factors identified in *Ekimian* and *Diaz-Covarrubias* leads to the conclusion that there is no sufficiently meaningful standard against which to judge the BIA's exercise of its discretion under this regulation. First, the federal regulation does not specify a standard that the BIA should apply in deciding when to accept or deny a late brief. Second, no statutory language authorizes the BIA to accept or deny a late brief. Third, no precedential BIA decision specifies a standard for accepting or denying a late brief.[5] As in *Ekimian* and *Diaz-*

---

[5]BIA decisions addressing late briefs do not announce a precedential standard. *See e.g.*, *In re Hassan Ibrahim Bazzi*, No. A75-415-118, 2007 WL 1125702 (BIA Feb. 23, 2007) ("As a matter of discretion, we will accept the respondent's late-filed appeal brief in light of the representations set forth in counsel's 'Motion to Submit Brief in Support of Appeal Out of Time' filed in conjunction with the respondent's brief."); *In re Javier Mejia-Hernandez*, No. A92-838-910, 2003 WL 23269902 (BIA Dec. 4, 2003) ("[A]s a courtesy in this case we will accept the respondent's late-filed brief in light of the respondent's counsel's statement that he is responsible for the untimeliness and is not familiar with simultaneous

*Covarrubias*, we cannot decipher a meaningful standard from either the regulatory language or the handful of BIA decisions addressing motions to accept late briefs. The regulation itself and the relevant BIA case law do "not provide any guidance to the BIA regarding when it should exercise its discretion" to accept an untimely appellate brief.[6] *Diaz-Covarrubias*, 551 F.3d at 1118. Accordingly, we hold that because "we cannot discover a sufficiently meaningful standard" for evaluating the BIA's decision rejecting an untimely brief, we lack jurisdiction to review Zetino's claim that the BIA abused its discretion in doing so. *Id.* at 1120 (quoting *Ekimian*, 303 F.3d at 1159) (internal quotation marks omitted).

**[5]** Zetino also challenges the BIA's discretionary decision on due process grounds. The REAL ID Act of 2005 specifically exempted constitutional challenges from the jurisdictional bar contained in 8 U.S.C. § 1252(a)(2)(B)(ii). *See* 8 U.S.C. § 1252(a)(2)(D); *see also Cabrera-Alvarez v. Gonzales*, 423 F.3d 1006, 1009 (9th Cir. 2005). Zetino's due process challenge is, of course, governed by a meaningful standard. *See infra* at Section III(A)(ii). Furthermore, several

---

briefing schedules."); *In re Manuel Palma Carrillo*, No. A96-362-442, 2004 WL 2374952 (BIA Aug. 24, 2004) ("The [motion to accept a late brief] is denied. The motion argues that the respondent trusted a non-attorney to file the brief on time. However, the motion does not state the name of this person, and does not specifically describe the agreement the respondent had with him or her. The motion merely contains generalized statements.").

[6]We note that this sentiment is present in the few cases in which we have been presented with abuse of discretion challenges to the BIA's denial of untimely briefs. Our cases have struggled to find any semblance of an actual standard. *See, e.g.*, *Garcia Gomez v. Gonzales*, 498 F.3d 1050, 1051 (9th Cir. 2007) (per curiam) (remanding because the court was "unable to determine from the BIA's conclusory statement whether it abused its discretion by refusing to accept [the] late brief"); *Ramirez v. Ashcroft*, 113 F. App'x 238, 240 (9th Cir. 2004) ("We also find unpersuasive petitioner's contention that the BIA's decision to reject their late-filed brief was improper.").

published and unpublished opinions have found jurisdiction over the BIA's rejection of an untimely brief on due process grounds. *See, e.g.*, *Singh v. Ashcroft*, 362 F.3d 1164, 1167 (9th Cir. 2004) (finding jurisdiction and holding that the BIA's rejection of a late brief violated petitioner's due process rights); *Garcia Cantor v. Gonzales*, 131 F. App'x 601, 602 (9th Cir. 2005) ("We have jurisdiction under 8 U.S.C. § 1252 to review the BIA's denial of the Petitioners' motion to file a late brief."); *Reyes Lopez v. Gonzales*, 143 F. App'x 831, 831-32 (9th Cir. 2005) ("Reyes Lopez's contention that the BIA violated his due process rights by denying his motion to accept a late brief fails because the BIA has discretion whether to grant motions for extensions of time or to accept late filings."). Accordingly, we have jurisdiction to review the BIA's denial of a motion to accept an untimely brief for a violation of due process.

## ii

**[6]** Turning to the merits of Zetino's challenge to the BIA's rejection of his untimely brief, we find that his due process rights were not violated. "The Fifth Amendment guarantees due process in deportation proceedings." *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999). An alien "must receive a 'full and fair hearing,' in order to meet the requirements of due process." *Id.* A petition for review will only be granted on due process grounds if "(1) the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case, and (2) the alien demonstrates prejudice, which means that the outcome of the proceeding may have been affected by the alleged violation." *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620-21 (9th Cir. 2006).

**[7]** First, Zetino's proceedings were not so fundamentally unfair that he was prevented from reasonably presenting his case. An alien has been provided with due process when he or she is given an opportunity "to be represented by counsel, prepare an application for . . . relief, and . . . present testimony

and other evidence in support of the application." *Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 926-27 (9th Cir. 2007). We have held that a petitioner's due process rights are violated if the BIA refuses to accept a late brief where the alien followed all procedures but the BIA sent the briefing schedule and transcript to an incorrect address. *See Singh*, 362 F.3d at 1168-69.

In *Singh*, the petitioner was unable to refute an IJ's adverse credibility finding in front of the BIA because he was never given notice of the briefing schedule. *Id.* at 1168. Here, not only was there no adverse credibility finding, but Zetino received an initial briefing schedule as well as a supplemental briefing schedule affording him a two week extension at his Texas detention facility. His failure to timely file a brief by the date of which he had advance notice was not due to the actions of the BIA, but rather to his six year delay in securing counsel.

While Zetino does not claim ineffective assistance of counsel, we have held that a petitioner's due process rights are not violated even where the failure to file the brief on time is the result of the petitioner's counsel's mistake. *See Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 822 (9th Cir. 2003). Here, Zetino did not secure his counsel until five days after the expiration of the filing deadline. It was quite impossible for his attorney to timely file his appellate brief. However, even if the errors of his counsel had contributed to the delay, Zetino's due process claim would still fail.

[8] Unlike both *Singh* and *Rojas-Garcia*, Zetino cannot point to anyone but himself to explain the untimeliness of his brief. We cannot conclude that by missing the deadline he had successfully extended he somehow deprived himself of due process. To hold to the contrary would mean that when the BIA enforced the previously extended filing deadline known to the petitioner the proceeding became fundamentally unfair. Such a holding would be contrary to existing due process

jurisprudence addressing filing deadlines. *See, e.g., United States v. Locke*, 471 U.S. 84, 101 (1985) (holding that a filing deadline under Federal Land Policy and Management Act carrying a penalty of an automatic forfeiture of a mining claim did not violate due process).

**[9]** Nevertheless, we have held an alien's due process rights are violated if the BIA summarily dismisses an appeal for failing to file a brief but the notice of appeal is sufficient to put the BIA on notice of the relevant issues on appeal. *See Garcia-Cortez v. Ashcroft*, 366 F.3d 749, 753-54 (9th Cir. 2004). In his Notice of Appeal, Zetino made a coherent argument asking the BIA to reverse the IJ's determination. He cited specific evidence regarding his fear of his family's murderers as well as his fear of gangs. However, the BIA did not summarily dismiss Zetino's appeal when his brief was untimely. Nor did the BIA summarily adopt the decision of the IJ instead of addressing each of Zetino's claims. In its decision, the BIA properly articulated Zetino's two fears: "He fears that he could be killed by the eleven unidentified masked gunmen who fatally shot his aunt, uncle, and at least three cousins in 1993 and who remain at large. He also fears members of gangs, who could attempt to recruit him." The BIA considered his arguments in turn, and affirmed the IJ's decision, holding that Zetino failed to establish a nexus between his fears and a protected ground. Thus, it did not prevent Zetino from reasonably presenting his case.

**[10]** Second, even if rejection of Zetino's brief could be considered a violation of his rights, he cannot show prejudice because the BIA considered all of the facts presented and applied them to the law. Zetino's articulation of his two fears could not have changed to such a degree between his Notice of Appeal and his brief that the BIA's decision would have changed. The BIA's review, and its rejection of Zetino's untimely brief, did not run afoul of the Fifth Amendment's Due Process Clause.

**B**

**[11]** Zetino's second argument on appeal is that the IJ violated his due process rights by failing to develop a factually complete record or advise him of his right to counsel. This argument is without merit.

The same standard applies to both this challenge and Zetino's due process challenge to the BIA's rejection of his untimely brief. *See supra* at Section III(A)(ii). Zetino was entitled to a full and fair hearing. *See Campos-Sanchez*, 164 F.3d at 450. Zetino was not prevented from reasonably presenting his case, nor were the proceedings before the IJ fundamentally unfair.

Zetino was advised of his right to counsel at his first appearance before the IJ on May 31, 2001. The IJ stated,

> [N]ow let me explain to you the rights that you will have in these hearings. First and foremost of those rights is the right to be represented. The Immigration Service today is represented by an attorney. You have the same right. You may be represented by an attorney or a representative who's been authorized and qualified to represent people before the Immigration Court . . . . If you want to have an attorney or representative represent you in these proceedings it must be at no expense to the Government. That means it is going to be your obligation to contact that individual.

In the colloquy between Zetino and the IJ, the IJ specifically advised him of his right to counsel and confirmed that he was provided with a list of free legal services. The IJ stated, "I'm going to show you a document. That document is called the legal aid list, and you . . . should have gotten a copy of this document when you got notice of today's hearing. Did you . . . receive a copy of this document that I'm showing you?"

Zetino answered, "Yes." Zetino even sought a continuance to obtain counsel. Zetino had almost six years between his first appearance and his final merits hearing to obtain counsel.

At the final hearing, Zetino called witnesses but chose not to question them. Zetino argues that he was not aware of his right to question his witnesses. However, the IJ specifically explained this right to him. When Zetino testified for himself, and when he chose not to question his witnesses, the IJ sufficiently developed the record, soliciting responses to several questions. First he asked, "Why do you fear returning to the country of El Salvador?" Then, "Any other reason why you fear [sic]?" Finally, "Do you know why they are killed or what the motivation was [sic]?"

The lawyer for the Department of Homeland Security also developed the record, asking Zetino and his family members numerous questions. The attorney began, "Why do you think they will harm you in particular?" Then, "Have you ever had any family members killed in El Salvador?" "[D]o you know who killed them?" "Do you know why this murder took place or what the motive was?" "[W]ere you hurt at all while you were in El Salvador?" Finally, "Do you think your son will be harmed if he returned to El Salvador?"

The IJ advised Zetino of his procedural rights and developed a thorough factual record. As a result, we find that the proceeding was not so fundamentally unfair that Zetino was prevented from reasonably presenting his case. His due process rights were not violated.

## C

Finally, Zetino argues that substantial evidence does not support the BIA's decision affirming the IJ's denial of his applications for asylum and withholding of removal. Under the substantial evidence standard, the petition for review must be denied if the BIA's determination was "supported by rea-

sonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481. Zetino bears the burden of proving that he is eligible for asylum or withholding of removal. *See* 8 C.F.R. §§ 1208.13, 1208.16; *Berroteran-Melendez v. INS*, 955 F.2d 1251, 1255-56 (9th Cir. 1992).

To be eligible for asylum, Zetino must demonstrate that he can qualify as a "refugee," meaning he is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To be eligible for withholding of removal, Zetino must demonstrate that his "life or freedom would be threatened in [his home] country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3). The REAL ID Act of 2005 places an additional burden on Zetino to demonstrate that one of the five protected grounds will be at least one central reason for his persecution. *See id.* § 1158(b)(1)(B)(i).

Zetino testified that he was fearful of returning to El Salvador because, in 1993, bandits attempting to steal his grandfather's farm had murdered his family members. Zetino did not present evidence that the bandits targeted his family on account of a protected ground such as their race, religion, nationality, membership in a particular social group, or political opinions. Rather, he testified that the farm was on fertile land, and thus valuable. Zetino implied that the only motivation for the murders was the land itself. He testified that the attackers "were insisting on the lands and [his] grandfather did not want to get rid of the land." Zetino also testified that he was afraid of gang violence because he had tattoos that gang members might mistake as a sign of membership in a rival gang.

[12] An alien's desire to be free from harassment by criminals motivated by theft or random violence by gang members

bears no nexus to a protected ground. *See id.* §§ 1231(b)(3), 1101(a)(42); *Gormley v. Ashcroft*, 364 F.3d 1172, 1177 (9th Cir. 2004) (holding that random criminal acts bore no nexus to a protected ground). Accordingly, the BIA properly ruled that Zetino did not meet his burden of proving that the potential harm he would suffer in El Salvador was "on account of" a protected ground such as "race, religion, nationality, membership in a particular social group, or political opinion." *Gormley*, 364 F.3d at 1176. Because the BIA's determination is supported by reasonable, substantial, and probative evidence in the record considered as a whole, the petition for review is denied.

## IV

We do not have jurisdiction to review the BIA's denial of Zetino's untimely brief for an abuse of discretion. As a result, this part of the petition is dismissed. Zetino's due process rights were not violated and substantial evidence supports the BIA's decision that Zetino did not demonstrate a nexus between the harm he fears and a protected ground. This part of the petition for review is denied.

**PETITION DISMISSED IN PART, DENIED IN PART.**

---

LAWSON, District Judge, concurring in part and concurring in the judgment:

I concur in the majority's decision to deny the petition and in most of its reasoning. I part company, however, with my colleagues' conclusion that we have no jurisdiction to review the Board of Immigration Appeals' (BIA) denial of the petitioner's motion to accept an untimely brief. The majority's holding amounts to an extension of circuit precedent laid down in *Ekimian v. INS*, 303 F.3d 1153 (9th Cir. 2002), and *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114 (9th Cir. 2009),

both of which, in turn, took their core premise from *Heckler v. Chaney*, 470 U.S. 821 (1985). In *Heckler*, the Supreme Court held that when Congress commits to an agency discretionary authority to perform an act without prescribing meaningful governing standards, that exercise of discretion is placed beyond judicial review by section 701(a)(2) of the Administrative Procedures Act (APA). *Id.* at 830; *see* 5 U.S.C. § 701(a)(2) (authorizing judicial review of final agency action "except to the extent that . . . agency action is committed to agency discretion by law"). I believe that *Ekimian* and *Diaz-Covarrubias* misread *Heckler* by applying it to agency decisions made discretionary by regulation, that is, by the agency itself, effectively permitting the agency to insulate its own decisions from judicial review. In *Kucana v. Holder*, No. 08-911, 558 U.S. ___, 2010 WL 173368 (Jan. 20, 2010), the Supreme Court concluded that such a scheme contravenes the "presumption . . . 'that executive determinations are generally subject to judicial review,' " slip op. at 16 (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)), "the longstanding exercise of judicial review of administrative rulings [on procedural matters]," *id.* at 2, and the "congressional design" that "[Congress], and only [Congress], would limit the federal courts' jurisdiction," *id.* at 17. Consequently, I would not extend *Ekimian*'s and *Diaz-Covarrubias*'s holdings to bar review of other agency actions — such as the decision whether to accept a late brief — that are based on authority made discretionary by the agency itself. I would find, however, that the BIA did not abuse its discretion in refusing the petitioner's late brief in this case.

## I.

*Heckler v. Chaney* was a case in which the Court was called upon to decide the extent to which Congress restricted federal court jurisdiction to review actions by administrative agencies under the APA. There, the Court rejected a claim by several death row inmates who sought a mandatory injunction to compel the Food and Drug Administration to enforce pro-

visions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., (FDCA) against officials in states that had adopted the lethal injection method for carrying out a death sentence. The inmates argued that the FDCA prohibited off-label use of drugs, and that the drugs chosen by the states could not be used for that purpose until the FDA approved the drugs as "safe and effective" for human execution. *Id*. at 827.

The Court held that the FDA's decision not to institute enforcement action was shielded from judicial review by section 701(a)(2) of the APA. In reaching that conclusion, the Court noted the tension between section 701(a)(2), which bars review of actions "committed to agency discretion," and section 706(2)(A), which authorizes judicial review to determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In construing section 701(a)(2), the Court cited *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), which characterized that statutory bar to judicial review as "a very narrow exception." 401 U.S. at 410. The *Overton Park* Court explained, "The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Ibid.* (citing S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).

The *Heckler* Court found that the exception to judicial review in section 701(a)(2) was categorically distinct from the exception in section 701(a)(1), which bars review when "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Court explained:

> [Section 701(a)(1)] applies when Congress has expressed an intent to preclude judicial review. [Section 702(a)(2)] applies in different circumstances; even where Congress has not affirmatively precluded

review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706 — if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion." In addition, this construction satisfies the principle of statutory construction mentioned earlier, by identifying a separate class of cases to which § 701(a)(2) applies.

*Heckler*, 470 U.S. at 830. The Court ultimately concluded:

The general exception to reviewability provided by § 701(a)(2) for action "committed to agency discretion" remains a narrow one . . ., but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise. In so holding, we essentially leave to Congress, and not to the courts, the decision as to whether an agency's refusal to institute proceedings should be judicially reviewable.

*Id.* at 838.

In *Heckler*, the Court determined that *Congress* can restrict the jurisdiction of federal courts over certain agency actions under the APA by deeming them "discretionary" and drafting "statutes" that provide a court "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. It does not support a conclusion that an *agency* can strip a court of jurisdiction to review its own actions by enacting regulations that deem these actions discretionary. Recog-

nizing such authority would fundamentally alter the constitutional checks and balances put in place by the separation of powers doctrine.

That point was made clear by the Court's recent decision in *Kucana v. Holder*, No. 08-911, 558 U.S. ___, 2010 WL 173368. In that case, the Court construed the jurisdiction-stripping provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009-546. That provision was found in 8 U.S.C. § 1252(a)(2)(B)(ii), which states that no court shall have jurisdiction to review any action of the Attorney General "the authority for which is specified under this subchapter to be in the discretion of the Attorney General." The Seventh Circuit found this statute to bar review of a decision by the BIA denying the petitioner's late motion to reopen removal proceedings because the Attorney General had made such decisions discretionary by regulation. The Court noted that Congress had not codified the provision in the regulation making such decisions discretionary. The Court read the phrase "specified under this subchapter" in section 1252(a)(2)(B)(ii) to mean that "Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana*, slip op. at 12.

With respect to motions to reopen, the Court concluded that Congress intended judicial review to be as broad as it was before the IIRIRA was enacted: "The BIA has broad discretion, conferred by the Attorney General, 'to grant or deny a motion to reopen,' 8 CFR § 1003.2(a), but courts retain jurisdiction to review, with due respect, the Board's decision." Slip op. at 15. The Court characterized decisions on motions to reopen as "adjunct rulings," which remain subject to judicial review. *Id.* at 13. "A court decision reversing the denial of a motion to reopen does not direct the Executive to afford the alien substantive relief; ordinarily, it touches and concerns only the question whether the alien's claims have been accorded a reasonable hearing." *Ibid.* Decisions to allow the

filing of a late brief fall squarely within this category; they are deemed discretionary by the agency, *see* 8 C.F.R. § 1003.3(c)(1), but Congress has not placed them beyond the scope of judicial review.

The Court's holding in *Kucana* was clear: "While Congress pared back judicial review in IIRIRA, it did not delegate to the Executive authority to do so." Slip op. at 18. Were it otherwise, "the Executive would have a free hand to shelter its own decisions from abuse-of-discretion appellate court review simply by issuing a regulation declaring those decisions 'discretionary.' " *Id.* at 17. That result would upset the "congressional design" in which "Congress ensured that it, and only it, would limit the federal courts' jurisdiction." *Ibid.*

## II.

In *Ekimian v. INS*, the court quoted language recited above from *Heckler v. Chaney* interpreting section 701(a)(2) and concluded that "[t]he text of [8 C.F.R.] § 3.2(a)[(now codified at 8 C.F.R. § 1003.2(a)] does not provide a standard controlling or directing the BIA's decision whether to reopen, and similarly provides no standard for reviewing the BIA's decision." 303 F.3d at 1157-58. The court in *Diaz-Covarrubias* quoted the same passage from *Heckler* and concluded that "the BIA has not set forth any meaningful standard for exercising its discretion to implement an administrative closure." 551 F.3d at 1118. Both courts then held that the lack of meaningful standards set out *in the regulations*, or otherwise described in its own decisions, stripped federal courts of jurisdiction to review the agency decisions to deny an untimely motion to reopen and to implement an administrative closure.

I believe these decisions misapply *Heckler* for several reasons. First, the Court in *Heckler* was construing a section of the APA in which Congress barred judicial review under very "narrow" circumstances not present in the context of reviewing BIA decisions. The jurisdictional bar required two legisla-

tive acts: (1) Congress barred judicial review of those administrative decisions made discretionary "by law" in the APA; and (2) Congress had to enact the "law" that delegated authority to the agency to act in its sole discretion. Second, the bar set forth in 5 U.S.C. § 701(a)(2) to discretionary decisions by an agency applies only "if the *statute* is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830 (emphasis added). There is no statute that commits to agency discretion the decision whether to accept late briefs. Third, neither *Heckler* nor any other Supreme Court precedent supports the proposition that the absence of review standards *in a regulation* enacted by an agency renders that agency's action under that regulation unreviewable. If it were otherwise, the agency could determine the scope of federal court jurisdiction to review its actions by the mere expedient of omitting review standards from its own regulations. Finally, reading *Heckler* to strip federal courts of jurisdiction to review decisions deemed discretionary by the agency itself collides with "the presumption favoring judicial review of administrative action." *Kucana*, slip op. at 16.

Because *Ekimian* and *Diaz-Covarrubias* misapply *Heckler*, I would not extend that circuit precedent to the present case.[1]

---

[1]The majority notes that the Supreme Court in *Kucana* specifically expressed no opinion on whether federal courts could review BIA refusals to reopen *sua sponte*, and therefore *Ekimian* remains good law. *See* slip op. at 2550 n.4 (citing *Kucana*, slip op. at 16 n.18). The majority correctly cites the footnote in *Kucana*, but I respectfully suggest that its conclusion does not follow. *Ekimian* relies exclusively on *Heckler* for its doctrinal premise that the absence of meaningful standards to guide an agency's discretion deprives the courts of jurisdiction to review agency decisions. The *Ekimian* court applied *Heckler* by stating: "The text of § 3.2(a) does not provide a standard controlling or directing the BIA's decision whether to reopen, and similarly provides no standard for reviewing the BIA's decision." *Ekimian*, 303 F.3d at 1157-58 (citing 8 C.F.R. § 3.2(a)). This obvious reference to a discretion-conferring *regulation* as the premise for application of *Heckler*'s rule, which requires *congressional* action, under-

Doing so would condone a scheme in which the Executive Branch would have the power to limit the jurisdiction of the federal courts. However, under the separation of powers doctrine, only Congress can expand or contract the subject-matter jurisdiction of a lower Article III court. *See Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). That principle is rooted in the text

---

mines *Ekimian*'s continuing validity in light of the Supreme Court's clear statement that when enacting the INA, "Congress ensured that it, and only it, would limit the federal courts' jurisdiction." *Kucana*, slip op. at 17. There is no statute that speaks to the BIA's authority to reopen proceedings *sua sponte*.

The majority of cases finding no jurisdiction to review denials of motions to reopen *sua sponte* on account of *Heckler* do so on the basis of standardless regulations. *See, e.g., Luis v. INS*, 196 F.3d 36, 40 (1st Cir. 1999); *Ali v. Gonzales*, 448 F.3d 515, 518 (2d Cir. 2006); *Calle-Vujiles v. Ashcroft*, 320 F.3d 472, 474-75 (3d Cir. 2003); *Doh v. Gonzales*, 193 F. App'x 245, 246 (4th Cir. 2006) (per curiam); *Enriquez-Alvarado v. Ashcroft*, 371 F.3d 246, 248-50 (5th Cir. 2004); *Harchenko v. INS*, 379 F.3d 405, 410-11 (6th Cir. 2004); *Pilch v. Ashcroft*, 353 F.3d 585, 586 (7th Cir. 2003); *Ekimian*, 303 F.3d at 1159; *Belay-Gebru v. INS*, 327 F.3d 998, 1000-01 (10th Cir. 2003); *Anin v. Reno*, 188 F.3d 1273, 1279 (11th Cir. 1999). The only two cases that cite a *statute* in concluding that such decisions are unreviewable point to 8 U.S.C. § 1103(g)(2), which generally authorizes "[t]he Attorney General [to] establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section." *See Tamenut v. Mukasey*, 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) ("The regulation establishing the BIA's authority to reopen *sua sponte* was promulgated pursuant to a general grant of regulatory authority that sets no standards for this decision. *See* 8 U.S.C. § 1103(g)."); *Lenis v. U.S. Attorney Gen.*, 525 F.3d 1291, 1293 (11th Cir. 2008) ("[N]o statute expressly authorizes the BIA to reopen cases *sua sponte*; rather, the regulation at issue derives from a statute that grants general authority over immigration and nationalization matters to the Attorney General, and sets no standard for the Attorney General's decision-making in this context. *See* 8 U.S.C. § 1103(g)(2)."). Under that rationale, however, *any* agency decision made under a regulation in which the agency grants itself discretion to act would be beyond judicial review where Congress granted general authority to the agency to make rules, which is to say, in virtually every case. That result directly contradicts *Kucana*'s central holding.

of the Constitution, which vests the judicial power in the Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish," U.S. Const. art III, § 1, and which gives to Congress the power "[t]o constitute Tribunals inferior to the supreme Court," U.S. Const. art I, § 8, cl. 9. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts."). Congress may alter federal court jurisdiction through legislation, but to do so it must satisfy the requirements of bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 957-58 (1983).

Although Congress may delegate certain legislative powers to administrative agencies, *Mistretta v. United States*, 488 U.S. 361, 373-74 (1989), "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213 (1976). Since the agency cannot make law, it cannot restrict judicial review of its actions through its own regulations. *See Gladysz v. Donovan*, 595 F. Supp. 50 (N.D. Ill. 1984) (invalidating the Secretary of Labor's regulations foreclosing judicial review of the agency action because "[g]iven the absence of legislative intent to foreclose judicial review, the Secretary cannot unilaterally 'make law,' . . . and prevent judicial review of his own decisions"); *cf. Chadha*, 462 U.S. at 942 n.13 ("The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review.").

The separation of powers doctrine prevents the Executive from unilaterally isolating his actions from judicial review. *See Morrison v. Olson*, 487 U.S. 654, 693 n.33 (1988) (stating that the purpose of judicial review of the actions of the Executive is to ensure that he executes the law in accordance with the will of Congress as expressed under the statute). "[I]t is the rule, not the exception, that executive actions — including those taken at the immediate direction of the President — are

subject to judicial review." *Nixon v. Fitzgerald*, 457 U.S. 731, 781 (1982). If the actions of the Executive are to be immunized from judicial review, it must be done by the legislative branch clearly expressing its intent to do so. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 680-81 (1986).

III.

In this case, the BIA's discretionary authority to accept a late brief is set out in a regulation, not a statute. The regulation, 8 C.F.R. § 1003.3(c)(1), states, "In its discretion, the Board may consider a brief that has been filed out of time." No statute confers this discretionary authority on the BIA, only the regulation itself. Consequently, the reasoning of *Heckler*, which is limited to congressional grants of discretion, does not extend to this regulation, nor does it insulate decisions made thereunder from judicial review.

Moreover, despite the lack of standards set out in the regulation, determining whether the BIA abused its discretion when denying the petitioner's motion to file a late brief is not a difficult task. The BIA's denial is the type of ruling that district courts regularly make, and which are routinely reviewed by this court. As we observed recently, "[t]here are countless types of district court rulings that we review for abuse of discretion." *United States v. Whitehead*, 532 F.3d 991, 995 (9th Cir. 2008). "When a district court makes a discretionary decision, we will affirm so long as the decision is within the range of permissible decisions that the court could have made given the law and the facts confronting it." *United States v. Mancinas-Flores*, No. 08-10094, ___ F.3d ___, 2009 WL 5125773, at *6 (9th Cir. Dec. 30, 2009).

Like motions to reopen, decisions on whether to allow a late brief are "adjunct rulings," which the Supreme Court described as "a procedural device serving to ensure that aliens are getting a fair chance to have their claims heard." *Kucana*, slip op. at 13 (internal quotation marks and alterations omit-

ted). The decision denying leave to file a brief out of time, therefore, requires consideration of the reasons the brief was not filed on time, the ability of the movant to present his case to the BIA if the brief is not considered, the BIA's need to enforce its own procedural rules and control its docket, and possible prejudice to other parties. In many ways, review of the decision tracks the same considerations discussed by the majority in determining that the petitioner was not deprived of procedural due process when his late brief was not accepted. I am satisfied that the BIA did not abuse its discretion by rejecting the late brief in this case because the petitioner was aware of the deadline, the BIA extended it once on its own motion, the petitioner's issues were set out adequately in his notice of appeal to permit meaningful review, and the delay was attributable solely to the petitioner and not to an outside agency.

## IV.

The BIA's authority to accept late briefs plainly is committed to its discretion by 8 C.F.R. § 1003.3(c)(1). There is no act of Congress that restricts the jurisdiction of the circuit courts from reviewing decisions under this regulation. Supreme Court precedent does not support the proposition that an agency in the Executive Branch can regulate the jurisdiction of the federal courts, nor does it provide support for the idea that judicial review is barred as a result of the absence of governing standards in the regulation. I would hold, therefore, that we have jurisdiction to review, with due respect, the BIA's decision not to accept the petitioner's late brief. I also would conclude that the BIA did not abuse its discretion. Therefore, I concur in the majority's opinion except for section III(A)(i), and in the judgment denying the petition.